## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Amber Hardtke, | Court File No. 21-cv-2733 (ECT/LIB) |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| City of East Grand Forks, et al., | |
| Defendants. | |

## <u>INTRODUCTION</u>

In January of 2020, Plaintiff Amber Hardtke was a Treatment Director at Douglas Place, a residential drug treatment facility in East Grand Forks, MN. On January 22, 2020, an Apprehension and Detention Order (ADO) was issued for the arrest of K.A.H., a patient at the facility. Drug treatment facilities are governed by federal law (42 CFR, Part 2), which strictly prohibits release of *any* information about patients at such facilities absent satisfaction of specific conditions or exceptions. On January 22, a police officer showed up with the ADO for K.A.H. that was not in compliance with 42 CFR, Part 2. Ms. Hardtke told the officer she cannot confirm or deny that K.A.H. was at the facility but took no further action to hide, conceal, harbor, or interfere with the arrest of K.A.H. The officer refused to search Douglas Place for K.A.H. and left the facility, but only after threatening to charge Ms. Hardtke for Obstruction of Legal Process and forcing her to provide her ID.

1

On January 23, Defendants Sgt. Hart and Lt. Hajicek showed up with a search warrant *directing them – not Douglas Place staff – to search* Douglas Place and seize K.A.H.'s intake and discharge records; but the search warrant once again was not in compliance with 42 CFR, Part 2. Ms. Hardtke told the Defendant Officers that the search warrant was not in compliance with federal law and that she would not be able to print and produce K.A.H.'s confidential treatment records. Just like the day prior, Ms. Hardtke did nothing to interfere with the Defendant Officers' ability to search Douglas Place – she simply told them that she would not assist them with executing the warrant. Instead of doing their job and executing the search warrant, the Defendant Officers arrested Ms. Hardtke for Obstruction of Legal Process and left the facility without making any effort to execute the search warrant. Ms. Hardtke was detained for two hours and charged by citation with misdemeanor obstruction, which was later dismissed. After they got sued, the Defendant Officers fabricated another excuse – that they also arrested Ms. Hardtke for felony harboring a fugitive.

As explained below, the undisputed facts show that there was no legal basis to arrest Ms. Hardtke for any crime on January 23, 2020, and that the Defendant Officers arrested her without arguable probable cause, in violation of the Fourth Amendment, and in violation of clearly established law. Accordingly, Ms. Hardtke respectfully requests that the Court grant her motion for partial summary judgment and enter judgment as to liability only with respect to Count 1 of the Second Amended Complaint.

## STATEMENT OF UNDISPUTED FACTS[1]

### *1. Standard for Determining the "Undisputed Facts" in Cases with Video Evidence.*

"The first step in assessing the constitutionality of [Defendants'] . . . actions is to determine the relevant facts." *See Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007). Generally, when considering a motion for summary judgment, the Court is required to adopt facts in light most favorable to the non-moving parties — the Defendant Officers in the instant case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, over the last decade, the U.S. Supreme Court and the Eighth Circuit have modified this standard for cases involving incidents that were video/audio recorded. In *Scott v. Harris*, the Supreme Court held that the "undisputed facts" for purposes of summary judgment in cases involving video evidence "[must be] viewed . . . in the light depicted by the videotape." *Scott*, 127 S. Ct. at 1776. Furthermore, when there is no evidence of the video evidence being "doctored," *id.* at 1775, the non-moving party's testimony that is "blatantly contradicted by the [video] record" must be disregarded and the district court must instead adopt the facts as they are depicted in the audio/video recording. *Id.* at 1776; *see also Wallingford v. Olson*, 592. F.3d 888, 893 (8th Cir. 2010); *Bernini v. City of St. Paul*, 665 F.3d 997, 1004-06 (8th Cir. 2012). Thus, as the Supreme Court emphasized in *Scott v. Harris*, if the nonmoving party's allegations on summary judgment are contradicted by reliable video evidence, such allegations can be disregarded because they are neither material nor genuine. 127 S. Ct. at 1776.

---

[1] The Exhibits referenced in this memorandum cite to the accompanying Declaration of Zorislav R. Leyderman.

*2. The Audio/Video Record Being Submitted in This Case.*

Plaintiff Amber Hardke had two encounters with law enforcement related to this case. The first encounter occurred on January 22, 2020, and the second encounter occurred on January 23, 2020. The January 22 encounter was captured on Officer Jacob Thompson's BWC video, and the January 23 encounter was audio recorded by Defendant Sgt. Hart. Plaintiff is submitting the following audio/video evidence for the Court's review and consideration:

1. Officer Thompson's BWC video from January 22, 2020, (Ex. 1);

2. Defendant Sgt. Hart's audio recording from January 23, 2020, (Ex. 2).

*3. The Relevant Facts Presented in Light Most Favorable to Defendants.*

**A. Plaintiff Amber Hardtke.**

Plaintiff Amber Hardtke lives in Shafer, MN, with her husband and their four children. (Ex. 4, p. 5.) Ms. Hardtke's third child was born in September of 2019, just four months prior to her arrest in this case. (Ex. 4, p. 6.) In January of 2020, Ms. Hardtke was living in East Grand Forks with her husband and three children. (Ex. 4, p. 89.) Both of Ms. Hardtke's parents worked in law enforcement until they retired and she generally has a lot of respect for law enforcement officials. (Ex. 4, p. 290.)

Ms. Hardtke graduated from high school in Rochester, MN, and later obtained a Bachelor of Science degree from North Dakota State University with a major in Sociology and a minor in Human Development Family Science. (Ex. 4, p. 12-14.) Ms. Hardtke then continued her formal education at Winona State University where she

completed a program in Addiction Studies and became a Licensed Alcohol and Drug Counselor (LADC) in 2014. (Ex. 4, p. 14, 16.) Ms. Hardtke remains licensed as an LADC through Minnesota's Board of Behavioral Health and Therapy. (Ex. 4, p. 16, 22.)

Ms. Hardtke started her career in Alcohol and Drug Counseling in 2012. (Ex. 4, p. 23-24.) She started her first job with Meridian in January of 2017. (Ex. 4, p. 58.) In March of 2019, Ms. Hardke was promoted to the position of "Treatment Director" at Meridian's Douglas Place and relocated her family from Rochester to East Grand Forks specifically to accept this promotion. (Ex. 4, p. 89.) In January of 2020, at the time of her arrest, Ms. Hardtke was working as the "Treatment Director" at Meridian's Douglas Place treatment facility, a position she had held since March of 2019. (Ex. 4, p. 89.)

**B. Douglas Place by Meridian Behavioral Health.**

Douglas Place is a substance use disorder treatment facility located in East Grand Forks, MN, and is operated by Meridian Behavioral Health.[2] "Douglas Place houses separate high intensity residential treatment programs for men and women within the Meridian Behavioral Health continuum of care."[3] "Everyone admitted into [Douglas Place] attends a full-time schedule of group therapy and individual sessions facilitated by a diverse team of licensed staff."[4] Douglas Place "utilize[s] evidence-based therapeutic practices to address individuals' Chemical Dependency and Co-occurring Mental Health

---

[2] Meridian Behavioral Health, Douglas Place, Men's and Women's, https://www.meridianprograms.com/program/douglas-place/ (last visited on June 24, 2024).
[3] *Id.*
[4] *Id.*

concerns."[5] In 2020, Douglas Place was an entity that provided substance use disorder diagnosis and treatment for its patients and, as such, was mandated to comply with federal law pertaining to such facilities – namely 42 CFR, Part 2: Confidentiality of Substance Use Disorder Patient Records. (Ex. 3, p. 60.) As noted above, in January of 2020, Ms. Hardtke was the "Treatment Director" for Meridian's Douglas Place treatment facility. (Ex. 4, p. 89.) During the same timeframe, Emily Peach was the "Director of Quality Compliance and Accreditation" for Meridian. (Ex. 3, p. 5-6.)

### C. Douglas Place Patient K.A.H.

According to Meridian's medical records, K.A.H. was a patient at Meridian's Douglas Place treatment center on January 22, 2020. (Ex. 7.) Records show that K.A.H. was admitted five days prior on January 17, 2020, and discharged on January 22, 2020. (Ex. 7.)

### D. 42 CFR, Part 2 – Confidentiality of Substance Use Disorder Patient Records.

42 CFR Part 2 is a set of federal regulations dealing with "Confidentiality of Substance Use Disorder Patient Records." The "purpose" of these regulations is to "impose restrictions upon the use and disclosure of substance use disorder patient records . . . which are maintained in connection with the performance of any part 2 program." 42 CFR, Part 2, Subpart A § 2.2(a). The "effect" of these regulations is to "prohibit the use and disclosure of records unless certain circumstances exist." 42 CFR, Part 2, Subpart A § 2.2(b)(1). The term "records" is defined broadly to include "any information, whether

---

[5] *Id.*

recorded or not, created by, received, or acquired by a part 2 program relating to a patient." 42 CFR, Part 2, Subpart B § 2.11. 42 CFR, Part 2 explicitly confirms that program staff is never compelled to release patient records to local law enforcement but may choose to do so if disclosure is permitted:

> If any circumstance exists under which use or disclosure is permitted, that circumstance acts to remove the prohibition on use and disclosure but it **does not compel** the use or disclosure. **Thus, the regulations in this part do not require use or disclosure under any circumstance other than** when disclosure is required by the Secretary [of Health and Human Services] to investigate or determine a person's compliance with this part pursuant to § 2.3(c).

42 CFR, Part 2, Subpart A § 2.2(b)(1) (emphasis added).

Subpart E of 42 CFR, Part 2 covers "Court Orders Authorizing Use and Disclosure" and provides the following mandates:

### § 2.61 Legal effect of order.

(a) *Effect.* An order of a court of competent jurisdiction entered under this subpart is a unique kind of court order. Its only purpose is to authorize a use or disclosure of patient information which would otherwise be prohibited by 42 U.S.C. 290dd-2 and the regulations in this part. Such an order does not compel use or disclosure. A subpoena or a similar legal mandate must be issued to compel use or disclosure. This mandate may be entered at the same time as and accompany an authorizing court order entered under the regulations in this part.

(b) *Examples.*

(1) A person holding records subject to the regulations in this part receives a subpoena for those records. The person may not use or disclose the records in response to the subpoena unless a court of competent jurisdiction enters an authorizing order under the regulations in this part.

(2) An authorizing court order is entered under the regulations in this part, but the person holding the records does not want to make the use or disclosure. If there is no subpoena or other compulsory process or a

subpoena for the records has expired or been quashed, that person may refuse to make the use or disclosure. Upon the entry of a valid subpoena or other compulsory process the person holding the records must use or disclose, unless there is a valid legal defense to the process other than the confidentiality restrictions of the regulations in this part.

42 CFR, Part 2, Subpart E § 2.61.

Section 2.65 outlines the "procedures and criteria for orders authorizing use and disclosure of records to criminally investigate or prosecute patients" and requires an "application," a "notice and hearing" provided to the "person holding the records," and "review of the evidence" at the hearing. 42 CFR, Part 2, Subpart E § 2.65(a)-(c). If disclosure is to be authorized by the Court, the following conditions must be met:

(d) **_Criteria._** A court may authorize the use and disclosure of patient records, or testimony relaying the information contained in those records, for the purpose of conducting a criminal investigation or prosecution of a patient only if the court finds that all of the following criteria are met:

(1) The crime involved is extremely serious, such as one which causes or directly threatens loss of life or serious bodily injury including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, and child abuse and neglect.

(2) There is a reasonable likelihood that the records or testimony will disclose information of substantial value in the investigation or prosecution.

(3) Other ways of obtaining the information are not available or would not be effective.

(4) The potential injury to the patient, to the physician-patient relationship and to the ability of the part 2 program to provide services to other patients is outweighed by the public interest and the need for the disclosure.

(5) If the applicant is a law enforcement agency or official, that:

8

(i) The person holding the records has been afforded the opportunity to be represented by independent counsel; and

(ii) Any person holding the records which is an entity within federal, state, or local government has in fact been represented by counsel independent of the applicant.

(e) ***Content of order.*** Any order authorizing a use or disclosure of patient records subject to this part, or testimony relaying the information contained in those records, under this section must:

(1) Limit use and disclosure to those parts of the patient's record, or testimony relaying the information contained in those records, which are essential to fulfill the objective of the order;

(2) Limit disclosure to those law enforcement and prosecutorial officials who are responsible for, or are conducting, the investigation or prosecution, and limit their use of the records or testimony to investigation and prosecution of the extremely serious crime or suspected crime specified in the application; and

(3) Include such other measures as are necessary to limit use and disclosure to the fulfillment of only that public interest and need found by the court.

42 CFR, Part 2, Subpart E § 2.65(d)-(e).

Section 2.66 of 42 CFR, Part 2 contains a separate section dealing with "procedures and criteria for orders authorizing use and disclosure of records to investigate or prosecute a part 2 program or the person holding the records." This section requires an "application" in compliance with the regulation. 42 CFR, Part 2, Subpart E § 2.66(a). If disclosure is to be authorized by the Court, the following conditions must be met:

(c) ***Requirements for order.*** An order under this section must be entered in accordance with, and comply with the requirements of § 2.64(e). In addition, an order under this section may be entered only if the court

9

determines that good cause exists. To make such good cause determination, the court must find that:

> (1) Other ways of obtaining the information are not available, would not be effective, or would yield incomplete information;

> (2) The public interest and need for the use or disclosure outweigh the potential injury to the patient, the physician-patient relationship, and the treatment services; and

> (3) For an application being submitted pursuant to paragraph (a)(3)(ii) of this section, the investigative agency has satisfied the conditions at § 2.3(b). Information from records obtained in violation of this part, including § 2.12(d), cannot be used in an application for a court order to obtain such records.

42 CFR, Part 2, Subpart E § 2.66(c).

**E. January 22, 2020.**

On January 22, 2020, at approximately 4:40 pm, East Grand Forks Police Officers Jacob Thompson and G. Trevino were dispatched to Douglas Place to pick up K.A.H. on an Apprehension and Detention Order (ADO) out of Stearns County. (Ex. 5.) Officer Thompson reported that dispatch told the officers that K.A.H.'s probation officer Michael Gilhoi called East Grand Forks Police Department and requested for K.A.H. to be picked up. (Ex. 5.) The ADO was signed on January 22, 2020, and states that K.A.H. was on pretrial supervision for domestic assault and that her detention was necessary to ensure community safety and prevent escape. (Ex. 6.) It further states, "NOW THEREFORE, pursuant to the authority vested in me by Minnesota Statutes, Section 243.05; 401.025; 260B.178 and 260B.175 I hereby order and direct the apprehension and temporary detention of the above-named individual pending the further order of the court." (Ex. 6.)

There is no dispute in this case that the ADO was not in compliance with 42 CFR, Part 2, Subpart E.

Officer Thompson reported that he arrived on scene with Officer Trevino and spoke with a supervisor by the name of Carly Carlson and explained to her that K.A.H.'s probation officer had revoked her and that the Officers needed to pick her up. (Ex. 5.) According to reports, Ms. Carlson told the Officers that she would go get K.A.H. and that the officers waited for about 20 minutes, at which point Ms. Hardtke came out and told the Officers "that they can not confirm or deny that [K.A.H.] is there." (Ex. 5.) Officer Thompson then told Ms. Hardtke that he needed Ms. Hardtke's and Ms. Carlson's IDs and that he "would be forwarding a report for charges for obstruction." (Ex. 5.) Shortly after, Ms. Hardtke and Ms. Carlson provided their IDs and Officer Thompson "informed [them] that [he] would be submitting a report to the prosecuting attorneys office for charges of obstruction." (Ex. 5.)

Officer Thompson's BWC video confirms the officers arriving and initially speaking with Ms. Carlson. (Ex. 1, 00:40-01:05.) Shortly after, Ms. Hardtke came out, greeted the Officers, and asked the Officers if they needed any help, which they declined. (Ex. 1, 01:30-02:00.) Approximately 15 minutes later, Ms. Hardtke came out and approached the Officers again. (Ex. 1, 17:20.) Ms. Hardtke then told the Officers, "So we can't confirm or deny that the patient is here." (Ex. 1, 17:20-17:30.) Officer Thompson then clapped his hands in obvious excitement and demanded Ms. Hardtke's ID, stating, "We're not gonna play this game, we know she's here. . . . So we'll just take IDs then and we'll forward it for obstruction . . . and we'll let the county attorney figure it out."

(Ex. 1, 17:30-18:00.) Ms. Carlson and Ms. Hardtke then left to get their IDs. (Ex. 1, 17:30-18:05.)

About 5 minutes later, the Officers had another employee take them to the secured area of the facility, at which point they ran into Ms. Hardtke who was on her way back to the lobby to speak with them. (Ex. 1, 23:00-24:00.) Ms. Hardtke told them that her ID was in her vehicle and that Ms. Carlson was outside getting both of their IDs. (Ex. 1, 23:00-24:00.) Ms. Hardtke also gave Officer Thompson a handout and explained, "This is our handout explaining the CFR Part 42 that we are obligated [to follow]. We would be happy to discuss it with the probation officer. . . .  But we have to follow that because we're obligated under CFR Part 42." (Ex. 1, 23:00-25:00.) Officer Thompson was under the impression that federal regulations governing residential treatment facilities are a game: "When you play these games, we're supposed to collect your IDs, submit it for charges for obstruction to the prosecuting attorney, so we'll let them figure it out." (Ex. 1, 23:00-25:00.) Officer Thompson later requested Ms. Hardtke's "role here," and she told him that she was the "Treatment Director." (Ex. 1, 24:30.) Shortly afterwards, Ms. Carlson returned with both her and Ms. Hardtke's IDs and they both provider their IDs to Officer Thompson. (Ex. 1, 26:00-28:00.) The Officers then collected the information they needed from Ms. Hardtke and Ms. Carlson's IDs and left the facility. (Ex. 1, 26:00-28:00.)

Officer Thompson's BWC video accurately captures all of Ms. Hardtke's interactions with law enforcement that day and what was said by Ms. Hardtke as well as the information provided to Ms. Hardtke by the Officers. (Ex. 1.) The BWC shows that

the only information the Officers provided to Ms. Hardtke about K.A.H. was that there was an ADO for her arrest and that the Officers intended to take her into custody. (Ex. 1, 17:00-18:00.) No further information about K.A.H. was provided to Ms. Hardtke about K.A.H. (Ex. 1.)

The BWC video further shows that Ms. Hardtke never physically, verbally, or otherwise interfered with the Officers' ability to search for or arrest K.A.H. on the Douglas Place premises (Ex. 1.) The Officers never asked Ms. Hardtke where K.A.H. was or how they can locate her, and Ms. Hardtke never made any statements about K.A.H.'s location inside the building. (Ex. 1.) Ms. Hardtke never told the Officers that K.A.H. was not at Douglas Place, nor did Ms. Hardtke ever deny that K.A.H. was there. (Ex. 1.) Ms. Hardtke also never interfered with the Officers' ability to search Douglas Place for K.A.H., she never blocked their path, and she never prevented them from entering, accessing, or searching any part of Douglas Place for K.A.H. (Ex. 1.) The video further confirms that (1) the only statement Ms. Hardtke made about K.A.H. on January 22 was that she could not confirm or deny that K.A.H. was at Douglas Place and (2) Ms. Hardtke never made any false or misleading statements about K.A.H.'s location. (Ex. 1.)

**F. January 23, 2020.**

Defendant Sgt. Hart testified that he wrote a supplemental report documenting his contact with Ms. Hardtke on January 23, 2020, and that everything in his report is true and accurate. (Ex. 10, p. 69-70.) According to his report, on January 23, Sgt. Hart reviewed the case and spoke with K.A.H.'s probation officer Michael Gilhoi by phone. (Ex. 8, p. 1.) At this point, Sgt. Hart "drafted a search warrant for the intake and

discharge paperwork for [K.A.H.]," and had the warrant approved by Judge Rasmusson. (Ex. 8, p. 1.) Sgt. Hart's application for the search warrant contains the following probable cause statement:

> On January 22nd, 2020, EGF PD Officer John Grabanski received a call from Stearns County Probation Agent Michael Gilhoi who stated the following;
>
> -He has issued an Apprehension and Detention Order (ADO) for [K.A.H.] . . . .
>
> -[K.A.H.] has been violating her DANCO order contacting the victim.
>
> -[K.A.H.] was released out of Stearns County to the Douglas Place in East Grand Forks.
>
> -He has contacted the Douglas Place and spoke with a counselor who confirmed [K.A.H.] was there.
>
> EGF PD Officer Gilbert Trevino and Cpl Jake Thompson were then dispatched to 1111 Gateway Drive (Douglas Place (Meridian Behavioral Health)) to apprehend [K.A.H.] on the ADO out of Stearns County.
>
> Officer Trevino and Cpl Thompson arrived on scene and spoke with Carly Ann Carlson . . . who is a supervisor at Douglas Place. Cpl. Thompson explained to Carlson that we had an ADO for [K.A.H.] and that her probation agent had revoked her. Carlson informed the Officers that she would go get her.
>
> The Officers then waited for approximately 20 minutes before an individual (later identified as Amber Rose Hardtke . . . ) came out and told us that they cannot confirm or deny that [K.A.H.] is there. (Affiant knows that Hardtke is the Treatment Director at the Douglas Place) At that time Cpl Thompson informed her that he needed her ID and Carlson's ID for possible obstruction charges. Hardtke left to a back office and was gone for several minutes. Eventually Cpl Thompson was able to identify Hardtke and Carlson by their ND DL's.
>
> On January 23rd, 2020, your Affiant spoke with Agent Michael Gilhoi over the phone. Agent Gilhoi told your Affiant that he had received a voicemail from a worker at the Douglas Place stating that [K.A.H.] signed out from

facility at 2200hrs. This is well past the time the Officers were at the Douglas Place to arrest [K.A.H.]. Agent Gilhoi also emailed me [K.A.H.]'s release order from January 16th stating that she would be released from custody to go to the Douglas Place.

Affiant is requesting permission to search and seize [K.A.H.] intake and discharge paperwork from the Douglas Place.

I request a search warrant be issued, commanding Tony Hart, Lt. Rod Hajicek, peace officers of the State of Minnesota, and any other authorized person, to enter and search between the hours of 7 a.m. and 8 p.m. to search the above described premises for the described property and thing(s), and to seize and keep said property and thing(s) in custody until dealt with according to law.

(Ex. 9, Bates 16-18.)

Polk County District Court Judge Anne Rasmusson then issued a "search warrant"

directing as follows:

## SEARCH WARRANT

TO: TONY HART, LT. ROD HAJICEK PEACE OFFICERS OF THE STATE OF MINNESOTA.

WHEREAS, Tony Hart has this day on oath made an application to this Court for a warrant to search the following described premises:

**Douglas Place is a large multi level brick building.**
**1111 Gateway Drive Northeast**
**This is a residential treatment facility.**

located in city or township of East Grand Forks, State of Minnesota for the following described property and thing(s):

**Intake and discharge paperwork for [K.A.H.] . . .**

WHEREAS, the application of Tony Hart was duly presented and read by the Court, and being fully advised in the premises:

NOW, THEREFORE, the Court finds that probable cause exists for the issuance of a search warrant upon the following ground(s):

- The property or things above-described constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime.

The court further finds that probable cause exists to believe that the above-described property and thing(s) is or are at the above-described premises

NOW, THEREFORE, you Tony Hart, Lt. Rod Hajicek, peace officers of the State of Minnesota, and any other authorized person, are hereby commanded to enter and search between the hours of 7 a.m. and 8 p.m., to search the above-described premises, for the described property and thing(s), and to seize and keep said property and thing(s) in custody until dealt with according to law.

(Ex. 9, Bates 19-20.)

At approximately 1:20 pm, Defendants Sgt. Hart and Lt. Hajicek "went to the Douglas Place and attempted to execute the warrant." (Ex. 8, p. 1.) Sgt. Hart confirmed that he audio-recorded the entire incident with a digital audio recorder. (Ex. 10, p. 28-29.)

According to his report, the Defendant Officers initially spoke with someone at the front desk and advised that they had a valid search warrant for the intake and discharge paperwork for K.A.H. (Ex. 8, p. 1.) Douglas Place employee Jamie Zuniga then came out and Sgt. Hart gave her a copy of the search warrant. (Ex. 8, p. 1.) "A short time later, another worker came out and tried to give us a 42CFR form (see attached)." (Ex. 8, p. 1.) The Defendant Officers responded that "we did not need that form." (Ex. 8, p. 1.) This worker told the Defendant Officers that they could not comply with the search warrant, and Sgt. Hart explained that it was a valid order signed by a judge. (Ex. 8, p. 1.) This worker then told the officers that she could not confirm or deny that the client was there. (Ex. 8, p. 1.) Sgt. Hart responded that the Defendant Officers already knew that K.A.H.

was no longer there and that all they needed was her intake and discharge paperwork. This worker then stated that she had to check with her boss, and Sgt. Hart requested "that we go back with her to speak with the boss." (Ex. 8, p. 1.) Sgt. Hart's audio recording captured this initial contact with Douglas Place staff. (Ex. 2, 00:00-12:30.)

Once they located Ms. Hardtke, she told them that she cannot give out K.A.H.'s intake and discharge paperwork. (Ex. 2, 12:50-13:00.) Sgt. Hart told Ms. Hardtke, "It's a search warrant, it's signed by a judge, it's valid anywhere in the State of Minnesota." (Ex. 2, 12:50-13:20.) Ms. Hardtke responded, "It doesn't override federal law." (Ex. 2, 12:50-13:20.) Both Sgt. Hart and Lt. Hajicek responded, "It does." (Ex. 2, 12:50-13:20.) Ms. Hardtke responded, "My compliance officer says that it doesn't . . . and I would get in contact with her. . . . I can give you her phone number so you can have a conversation with her." (Ex. 2, 12:50-13:20.) The Defendant Officers engaged in further discussion with Ms. Hardtke and the other employee and Ms. Hardtke explained that the federal law she was following was directed "specifically for patients in chemical dependency treatment." (Ex. 2, 13:00-14:00.)

Instead of executing the search warrant, Sgt. Hart called Crookston City Attorney Tanner Holten to validate his obsession with arresting Ms. Hardtke. (Ex. 2, 15:50; Ex. 8, p. 2; Ex. 10, p. 73-74, 131.) When Mr. Holten answered, Sgt. Hart went right to the point: "We got search warrants approved and the director is failing to comply. Can we arrest her?" (Ex. 2, 15:50-16:15.) Mr. Holten made some comments that are inaudible in the recording, and Sgt. Hart responded, "They're trying to give us this bullshit form." (Ex. 2, 15:50-16:20.) Mr. Holten, eventually states, "You gotta do something, I don't know what

it is." (Ex. 2, 17:00-17:40.) Sgt. Hart responded, "Yeah, . . . we gotta make a point here, I wanna lock her up." (Ex. 2, 17:00-17:40.)

Sgt. Hart next spoke with Assistant County Attorney Clifford Wardlaw. (Ex. 8, p. 1; Ex. 10, p. 28; Ex. 2, 19:10.) Sgt. Hart told Mr. Wardlaw, "Treatment director is refusing the search warrant." (Ex. 2, 19:30-19:45.) Sgt. Hart then put Mr. Wardlaw on speaker and stood by as he spoke with Ms. Hardtke. (Ex. 2, 19:45-20:15.) Ms. Hardtke then called Emily Peach for further guidance and to connect her with Mr. Wardlaw. (Ex. 2, 19:45-21:50.) In the meantime, Sgt. Hart was becoming inpatient in that his obsession with arresting Ms. Hardke was being delayed, "What are your thoughts for taking her into custody for obstructing, Cliff?" (Ex. 2, 21:50-22:10.) Ms. Peach was then supposed to call Mr. Wardlaw and speak with him directly but there was a delay. (Ex. 8, p. 2.)

Mr. Wardlaw then spoke with Ms. Hardke again and asked why she was refusing to provide K.A.H.'s intake and discharge paperwork. (Ex. 2, 25:30-26:30.) Ms. Hardtke explained, "She didn't sign a release of information." (Ex. 2, 25:30-26:30.) Mr. Wardlaw seemed puzzled and explained, "I've kind of run into this with your facility before, about the lack of cooperation with law enforcement and making claims that, 'HIPAA prevents this, HIPAA prevents that.'" (Ex. 2, 25:30-26:30.) Mr. Wardlaw further explained, "Now you tell me there's a federal law, and I was a federal prosecutor for 22 years, and I'm not aware of any federal law that would prevent the release of information pursuant to a court order." (Ex. 2, 26:00-27:30.) Ms. Hardtke explained again, "It is 42 CFR, Part 2." (Ex. 2, 26:00-27:30.) Mr. Wardlaw then demanded to know what the federal law says, and Ms.

Hardke read to him the criteria for valid court orders directly from 42 CFR, Part 2. (Ex. 2, 27:00-28:30.)

Ms. Hardtke then explained to Sgt. Hart and Lt. Hajicek that she was simply doing her job:

> I have to follow my part. I'm not trying to be difficult. I really am not. But I have to follow what is ordered of me to do. . . .  I really want to work with you guys in this situation and I'm trying to work with you but . . . I have things that are preventing me from doing that.

(Ex. 2, 30:00-31:00.) Ms. Hardtke told the Defendant Officers that K.A.H.'s probation officer already had the records they were looking for and suggested that the Officers get them from the probation officer.   (Ex. 2, 30:00-31:00.) But the Defendant Officers refused, "The court order says we're coming here to get it." (Ex. 2, 30:00-31:30.) Eventually Ms. Peach connected with Mr. Wardlaw by phone and they had a conversation. (Ex. 2, 32:00-33:00.) After a brief discussion, Mr. Wardlaw told Ms. Peach, "Oh, thank you for your call."  (Ex. 2, 32:00-33:00.) Sgt. Hart then finally got what he had been waiting for all along when Mr. Wardlaw stated, "Tony – arrest her." (Ex. 2, 32:00-33:00.) Sgt. Hart and Lt. Hajicek then escorted Ms. Hardtke to the lobby and had another officer place Ms. Hardtke under arrest and transport her to the East Grand Forks Police Department. (Ex. 8, p. 1.) During this process, Ms. Hardtke was also handcuffed and searched. (Ex. 10, p. 31.) While waiting for a squad to arrive, another Douglas Place staff asked what Ms. Hardtke was being arrested for, and Sgt. Hart replied, "Obstructing, interference with the legal process – whatever." (Ex. 2, 34:30-35:00.) Ms. Hardke

remained under arrest until approximately 4:06 p.m., at which time she was released from custody. (Ex. 10, p. 56.)

The "bullshit form" Sgt. Hart referenced during his phone conversation with Mr. Holten (and which is also referenced as being "attached" to his police report, (Ex. 8, p. 1)), is Meridian's publication on "Confidentiality of Alcohol and Substance Abuse Programs" which specifically states, "This document summarizes Meridian's obligations under 42 CFR Part 2." (Ex. 11.) This publication specifically explains that federal law governs release of information for patients in addiction treatment services and further explains that any court order, warrant, or subpoena must comply with 42 CFR, Part 2, Subpart E in order for Meridian to be able to comply. (Ex. 11.) Meridian's publication concludes as follows: "Therefore, please respect Meridian's desire to comply with federal laws that govern the services we provide. Meridian staff has been trained to consistently respond to such questions by saying "we can neither confirm nor deny" to remain in compliance with federal law." (Ex. 11.)

During their depositions, Sgt. Hart and Lt. Hajicek were specifically asked to state the criminal offenses for which Ms. Hardke was arrested and to state all facts which formed probable cause to arrest Ms. Hardtke for any possible crime. Sgt. Hart testified as follows:

> Q. . . . So first the offenses. What were the offenses for which you believe you had probable cause to arrest her on that date?
>
> A. Harboring and obstructing.
>
> Q. Harboring a fugitive and obstruction of legal process, correct?

A. Correct.

Q. These are two separate criminal statutes under the Minnesota Criminal Code, right?

A. Correct.

Q. And you thought you had probable cause to arrest from both of these, correct?

A. Correct.

Q. Tell me now about the facts. So what facts did you have to believe that there was probable cause to arrest Ms. Hardtke for both of these offenses?

A. Harboring, we confirmed that KH was at the Douglas Place the day before. Probation confirmed it with the Douglas Place. Dispatch confirmed it with the Douglas Place. We went there, employees said that -- I believe that they were going to go get KH. Ms. Hardtke then came out and said, "We cannot confirm or deny that she's here." And we find out later that she had been at the Douglas House -- Douglas Place for about five hours after that and then left. The obstructing, we served her with a signed search warrant for intake and discharge paperwork, and she would not comply with that.

Q. Okay. So had you laid out at this point all the facts on which you relied to form probable cause to arrest Ms. Hardtke for any offense on January 23rd, 2020?

A. Yes.

(Ex. 10, p. 35-37.) Lt. Hajicek was asked the same questions and answered as follows:

Q. . . . So the first question is which offenses . . . did you believe you had probable cause to arrest Ms. Hardtke for that day?

A. Obstructing was obvious and right in front of me, and possibly harboring a fugitive.

. . .

Q. Now, tell me all the facts. . . . I want to know what facts you had in your possession which formed probable cause to arrest Ms. Hardtke. What had she done that you believe was a crime?

A. I have a court order to pick up documents there. She is refusing to abide by that court order. I believe that's obstructing, and that was an obvious crime in front of me.

Q. And what?

A. And the County Attorney was on the phone agreeing with us, which is also helpful.

Q. Any other facts, sir, besides what you just told me, on which you relied to form probable cause to arrest Ms. Hardtke for any criminal offense?

A. I do know that there was the problem the night before also.

. . .

Q. Have we covered all the facts which form probable cause in your opinion to arrest her on January 23rd?

A. I don't know if we covered all of the facts.

Q. So let's cover all of them. So tell me what else did she do on January 23rd that gave you probable cause to arrest her. I'm going to ask you about the prior day afterwards, so I'm talking about now just her actions on January 23rd. What else did she do that gave you probable cause to arrest her on January 23rd in addition to the facts that you already gave me?

. . .

Q. . . . Anything else that we haven't covered yet?

A. No.

. . .

Q. Now, let's go to January 22nd. . . . What did you know about what she had done on January 22nd that gave you probable cause to arrest her?

A. I knew her name was in the reports as being involved that night, and at least they had taken her ID, and that she was refusing to allow them access to KH, I believe it is, and would not allow them to investigate the Danco violation.

Q. What did you know about how . . . did she not allow them to investigate the Danco violation? What did she do to not allow them to investigate?

A. She's not providing anything to them. She won't let them speak to the person, arrest the person on the ADO. She's not providing the person or helping with the investigation whatsoever.

Q. And that would be based on information from Sergeant Hart and the reports from what happened on January 22nd. Correct?

A. Correct.

Q. And you had assumed that whoever dealt with her on January 22nd from your police department would have accurately reported what happened that day in their reports. Correct?

A. Yes.

Q. All right. Any[] . . . other facts that you had in your possession on January 23rd to support Ms. Hardtke's arrest?

A. Not that I recall.

(Ex. 12, p. 71-77.)

In their depositions, Sgt. Hart and Lt. Hajicek were also asked what they did to actually search for the intake and discharge records as they were directed by the search warrant. Sgt. Hart and Lt. Hajicek both admitted that, besides showing up at Douglas Place and waiving the warrant around, they did exactly nothing to execute the warrant or search for K.A.H.'s records. Sgt. Hart testified they didn't search Douglas Place for the records because they had no idea where the records were or where to begin the search. (Ex. 10, p. 37-38.) He explained that Douglas Place is "a massive facility" with multiple

locked doors, that the records were likely computerized, and that the Officers did not know how to access or gather computerized treatment records. (Ex. 10, p. 37-38.) But Sgt. Hart admitted that he was fully trained and that his department had the necessary resources to execute challenging search warrants involving locked rooms or buildings. (Ex. 10, p. 38-41.) Sgt. Hart admits that the Officers never specifically instructed Ms. Hardtke to retrieve K.A.H.'s records, to open any doors for them, or to give them access to any computers used for storing treatment records. (Ex. 10, p. 42-44.) Instead, the Officers expected that Ms. Hardtke was somehow obligated to do their job and execute the search warrant for them: "I relied on her to give us assistance through that search warrant." (Ex. 10, p. 43.)

Lt. Hajicek likewise admitted that the Officers did  nothing to search Douglas Place for K.A.H.'s records:

> Q. All right. So back to January 23rd . . . did you personally do anything to search Douglas Place for the records that were the subject of the search warrant?
>
> A. No.

(Ex. 12, p. 77.) Lt. Hajicek also admitted that the Officers did not give Ms. Hardtke any directives to give them access to any rooms or computers where K.A.H.'s records were being stored, and they never directed Ms. Hardtke to print the records for them. (Ex. 12, p. 78-80.) Just like Sgt. Hart, Lt. Hajicek expected Ms. Hardtke to execute the warrant for them: "The search warrant directs her specifically to give us those records." (Ex. 12, p. 80.)

During their depositions, Sgt. Hart and Lt. Hajicek were specifically asked whether Ms. Hardtke did anything to interfere with their ability to execute the search warrant or search Douglas Place for K.A.H.'s records as directed in the search warrant. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) Both officers admitted that Ms. Hardtke did not take any physical, verbal, direct, or indirect action to interfere with their ability to execute the search warrant. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) Sgt. Hart and Lt. Hajicek specifically admitted that Ms. Hardtke never blocked them from entering any location within Douglas Place and she never directed anyone to do so. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) It is undisputed that Ms. Hardtke never attempted to lock any doors to prevent entry nor did she direct anyone else to do so. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) Ms. Hardtke never took action to hide or lock any computers and never directed anyone else to do so. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) Ms. Hardtke never made physical contact with the Officers, never yelled at them, and never instructed anyone else to yell at them. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.) Ms. Hardtke never made any statements at all about the location of K.A.H.'s records and took no action to prevent the Defendant Officers from seizing any evidence from Douglas Place. (Ex. 10, p. 45-49; Ex. 12, p. 82-88.)

### G. Plaintiff's Experts Establish that Defendants' Decision to Arrest Ms. Hardtke Constitutes Professional Incompetence.

Ms. Hardtke timely disclosed/produced two law enforcement expert reports in this case to which the Defendants offered no response. Plaintiff's first expert is Captain Spencer Fomby, who is a highly qualified police practices expert. (Ex. 13.) Plaintiff's second expert is Laurie Korenbaum, who is an expert prosecuting attorney. (Ex. 14.)

Both expert reports are being produced in their entirety for the Court's consideration. (Ex. 13, 14.)

Capt. Fomby provides the following opinions pertaining to Sgt. Hart and Lt. Hajicek:

1. That Sgt. Hart and Lt. Hajicek failed to follow industry standards and best practices in executing the search warrant when they demanded and expected Ms. Hardtke to execute the warrant for them, (Ex. 13, p. 4);

2. That Sgt. Hart and Lt. Hajicek failed to follow proper procedures for executing a low-risk search warrant for business records, (Ex. 13, p. 5);

3. That Sgt. Hart and Lt. Hajicek violated industry standards and best practices by calling prosecutors instead of using their own professional judgment, (Ex. 13, p. 5);

4. That there was no probable cause to arrest Ms. Hardtke for Obstruction of Legal Process (Minn. Stat. § 609.50) or Aiding an Offender, (Minn. Stat. § 609.495), and that the Defendant Officers abused their authority by intimidating Ms. Hardtke, (Ex. 13, p. 6-8);

5. That Sgt. Hart and Lt. Hajicek "either (1) knowingly violated the law; or (2) were incompetent in accepted police standards and best practices for executing low-risk warrants for business records and confidential substance use disorder patient records; or (3) both," (Ex. 13, p. 7-8).

Ms. Korenbaum provided a review of Mr. Wardlaw's conduct related to Ms. Hardtke's arrest, and she concluded as follows:

It is my opinion . . . that ACA Wardlaw failed to follow accepted professional standards in his role as an advising prosecutor. It is my opinion . . . that no reasonable prosecutor would advise the Officers to arrest Ms. Hardtke under the circumstances of this case and that ACA Wardlaw's conclusions and advice given in this case were unreasonable and unprofessional. Finally, due to the egregious nature of his actions, it is my opinion . . . that ACA Wardlaw's conduct in this case demonstrates professional incompetence.

(Ex. 14, p. 10-11.)

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

<u>**ARGUMENT**</u>

**I.    DEFENDANTS SGT. HART AND LT. HAJICEK VIOLATED THE FOURTH AMENDMENT WHEN THEY ARRESTED MS. HARDTKE WITHOUT ARGUABLE PROBABLE CAUSE IN VIOLATION OF CLEARLY ESTABLISHED LAW.**

**A.    Legal Standard.**

"The Fourth Amendment safeguards the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001). A police officer can lawfully arrest a suspect without a warrant when the police officer has probable cause to believe that the suspect has committed a crime. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010). Probable cause to arrest a suspect exists when the facts and circumstances within the officer's knowledge and of which the officer had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Id.* "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotations omitted). A "reasonable ground for belief" means "more than bare suspicion," but "less than evidence which would justify . . . [a] conviction." *Id.* (internal quotations omitted). "It is fundamental that an arrest violates the Fourth Amendment when there exists no . . . probable cause that an individual is engaged in criminal activity." *Gainor v. Rogers*, 973 F.2d 1379, 1387 (8th Cir. 1992).

"Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United State v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003.) "The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold an otherwise invalid search or seizure." *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (internal quotations omitted).

In *Scott v. Harris*, the Supreme Court held that the "undisputed facts" for purposes of summary judgment in cases involving audio/video evidence "[must be] viewed . . . in the light depicted by the videotape." *Scott*, 127 S. Ct. at 1776. Furthermore, when there is no evidence of the video evidence being "doctored," *id.* at 1775, the non-moving party's testimony that is "blatantly contradicted by the [video] record" must be disregarded and the district court must instead adopt the facts as they are depicted in the video recording. *Id.* at 1776.

In order to resolve the issue of probable cause to support an arrest in a Section 1983 action, it is necessary to first determine the applicable criminal statutes under state law. *See Neiters v. Holtan*, 83 F.4th 1099, 1106 (8th Cir. 2023) (considering an Iowa criminal statute and Iowa caselaw interpreting it); *Small v. McCrystal*, 708 F.3d 997, 1003-1005 (8th Cir. 2013) (same); *Hoyland v. McMenomy*, 185 F.Supp.3d 1111, 1122 (D. Minn. 2016) (reviewing Minnesota's obstruction statute and relevant state caselaw); *Johnson v. Courtois*, File No. 17-cv-3608 (ECT/DTS), 2018 WL 6726892, at *7-9 (D.

Minn. Dec. 21, 2018) (same); *Johnson v. City of Minneapolis*, Civ. File No. 08-359 (MJD/JJK), 2009 WL 10711599, at *3-6 (D. Minn. Aug. 24, 2009) (same). In the present case, the two statutes at issue are Minnesota's Obstruction of Legal Process statute (Minn. Stat. § 609.50), and Aiding an Offender statute (Minn. Stat. § 609.495). In the present case, applying the collective knowledge doctrine and viewing the facts in light most favorable to the Defendants, including the uncontroverted evidence as depicted in the audio/video recordings, the undisputed facts show that the Defendant Officers arrested Ms. Hardtke without probable cause in violation of the Fourth Amendment.

**B.      The Defendant Officers Did Not Have Actual or Arguable Probable Cause to Arrest Ms. Hardtke for Obstruction of Legal Process or Aiding an Offender Under Clearly Established Precedent.**

Section 609.50, provides, in relevant part, as follows:

> Whoever intentionally does any of the following may be sentenced as provided in subdivision 2: (1) obstructs, hinders, or prevents the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense; (2) obstructs, resists, or interferes with a peace officer while the officer is engaged in the performance of official duties . . . .

§609.50, subd. 1(1)-(2).

Minn. Stat. § 609.495, provides, in relevant part, as follows:

> Whoever knowingly harbors, conceals, or aids a person who is on probation, parole, or supervised release because of a felony level conviction and for whom an arrest and detention order has been issued, with intent that the person evade or escape being taken into custody under the order, may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $5,000, or both. As used in this paragraph, "arrest and detention order" means a written order to take and detain a probationer, parolee, or supervised releasee that is issued under section 243.05, subdivision 1; 244.195; or 401.025.

§ 609.495, subd. 1(b).

In *State v. Krawsky*, the Minnesota Supreme Court considered, in detail, what type of conduct is prohibited under section 609.50. 426 N.W.2d 875 (1988). *Krawsky* held that the "statute forbids intentional physical obstruction or interference with a police officer in the performance of his official duties." *Id.* at 877. The Court emphasized in *Krawsky* that the criminal suspect's "intent" to physically obstruct the officer is an essential element of the crime. *Id. Krawsky* also defined the terms "obstruction" and "interference" as "substantially frustrating or hindering the officer in the performance of his duties." *Id. Krawsky* emphasized, however, that the statute "does not apply to the mere act of interrupting an officer, even intentionally." *Id.* at 878.

In *State v. Patch*, the Minnesota Court of Appeals confirmed that Obstruction of Legal Process under Minnesota state law requires some form of "obstructive physical conduct." 594 N.W.2d 537, 539 (Minn. Ct. App. 1999). In *State v. Tomlin*, the Minnesota Supreme Court reaffirmed its holding from *Krawsky* and held that obstruction requires "a finding that the accused physically obstructed or interfered with a police officer while that officer was engaged in the performance of his official duties." 622 N.W.2d 546, 549 (Minn. 2001); *see also Hoyland*, 185 F. Supp.3d at 1122-23.

In *Tomlin*, the Defendant "lied to [the] police to cover up for his friends who were involved in a hit-and-run accident." 622 N.W.2d at 546-48. The defendant's lies resulted in a delay in apprehending the suspects and "they were not arrested until 36 hours after the accident [and] all blood alcohol evidence was lost." *Id.* at 548. Still, the Minnesota Supreme Court reversed the conviction in *Tomlin* because there was "[no] instance in the

record where Tomlin's lies and omissions physically obstructed the officers." *Id.* at 549. The Court further explained, "All of these false statements may have lengthened the time in which it took the police to apprehend [the suspects], but these statements did not physically prevent or obstruct the police from trying to obtain the evidence."

This Court considered an analogous situation in *Johnson v. City of Minneapolis*, where the plaintiff was arrested for obstruction yet video of the subject incident conclusively established that the plaintiff did not engage in any physical action to obstruct or interfere with law enforcement. 2009 WL 10711599, at *3-6. Relying on *Scott v. Harris* (for its holding that audio/video evidence must be viewed as depicted) and *State v. Krawsky* (for its holding that obstruction requires some physical conduct), this Court determined that there was absolutely no evidence in that case that the plaintiff physically obstructed legal process and, as a result, determined that there was no actual or arguable probable cause and that qualified immunity did not apply. *Id.* at *6. This Court concluded, "[I]t was clearly established at the time of the incident that an individual cannot be arrested under Minn. Stat. § 6009.50 unless that individual commits an intentional physical act of obstruction or interference, or uses words that have the same effect."

More recently, in *Johnson v. Courtois*, this Court considered another 1983 claim where the defendant officer sought qualified immunity after arresting the plaintiff for obstruction. 2018 WL 6726892, at *6-9. This Court once again reviewed *Krawsky* and confirmed that arguable probable cause to support arrest for obstruction requires at least some physical conduct by the arrestee under clearly established precedent. *Id.* at *7. In

that case, the plaintiff was standing 3-4 feet away from an officer who was arresting her friend and asking him questions. *Id.* at *9. This Court determined that this conduct, even if it interrupted the officers arresting the plaintiff's friend, was insufficient to establish arguable probable cause for obstruction. *Id.*

Turning to the present case, the undisputed evidence, including the BWC recording from January 22, the audio recording on January 23, and the Defendant Officers' admissions during their deposition testimony, establishes, as a matter of law, that that there was no actual or arguable probable cause to arrest Ms. Hardke for any offense at any time. On January 22, the only thing she did was tell Officer Thompson that she cannot confirm or deny that K.A.H. was at the facility. There was no evidence that Ms. Hardtke took any physical action to interfere with Officer Thompson's ability to search for K.A.H. or to arrest her. There was likewise no evidence that Ms. Hardtke attempted to harbor or assist K.A.H. evade arrest. The ADO Officer Thompson presented was invalid because it was not in compliance with 42 CFR, Part 2. Ms. Hardtke gave Officer Thompson Meridian's 42 CFR, Part 2 publication and complied with his directives to provider her ID and answered all his other questions. Finally, Ms. Hardtke had no obligation to speak with Officer Thompson in the first place or assist law enforcement in executing the ADO.

In *State v. Ogris*, the Minnesota Court of Appeals considered the meaning of the terms "harbor" and "conceal" within the context of section 609.495. No. A08-1001, 2009 WL 5088735 , at *3-4 (Minn. Ct. App. Dec. 29, 2009):

Under CRIMJIG 24.11, "'To harbor a person' means to furnish the person with shelter or food in such circumstances that the person is aided in avoiding detection by lawful authority." 10A *Minnesota Practice,* CRIMJIG 24.11. And under CRIMJIG 24.11, "'To conceal a person' means to make it more difficult for the person to be found." *Id. Black's Law Dictionary* defines "harboring" as "[t]he act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien." *Black's Law Dictionary* 733 (8th ed.2004). *The American Heritage Dictionary* defines "harbor" as "[t]o give shelter to." *The American Heritage Dictionary* 798 (4th ed.2006). *Black's Law Dictionary* defines "concealment" as "[t]he act of refraining from disclosure; esp., an act by which one prevents or hinders the discovery of something; a cover-up" and "[t]he act of removing from sight or notice; hiding." *Black's Law Dictionary* 306 (8th ed.2004). *The American Heritage Dictionary* defines "conceal" as "[t]o keep from being seen, found, observed, or discovered." *The American Heritage Dictionary* 381 (4th ed.2006).

In the present case, there was no evidence that Ms. Hardtke was aiding, harboring, or concealing K.A.H. in any way. Ms. Hardtke did not furnish K.A.H. with food or shelter, as K.A.H. had been admitted to the facility five days prior. Ms. Hardtke also did not do anything to make it more difficult for K.A.H. to be found or located by law enforcement and there was no evidence that Ms. Hardtke was doing anything to hide or protect K.A.H. in any way. At best, Ms. Hardtke's statement that she could not confirm or deny that K.A.H. was at the facility equates to Ms. Hardtke telling law enforcement that she will not assist with finding or arresting K.A.H. But civilians have no legal obligation under state or federal law to assist law enforcement, and it is not a crime to decline a police officer's request to get involved in law enforcement activity.

Furthermore, this was not a situation involving friends, relatives, or co-defendants who could be presumed to have a personal interest in shielding the fugitive; instead, all involved police officers knew that Ms. Hardtke was a Treatment Director at the facility

and that she was simply carrying out her tasks as directed by her employer and as mandated by federal law. No reasonable police officer could believe that Ms. Hardtke was engaged in criminal obstruction or harboring of K.A.H. on January 22 by telling Officer Thompson that she could not confirm or deny that K.A.H. was at the facility. Similarly, no reasonable police officer could believe that Ms. Hardtke would risk arrest and criminal prosecution for the purpose of intentionally harboring a random patient at the facility where she worked.

On January 23, Ms. Hardtke simply told the Defendant Officers that she cannot print and provide a copy of K.A.H.'s confidential treatment records but, just like the day prior, she did not do anything whatsoever to physically obstruct or interfere with the Defendant Officers' ability to execute the search warrant. Neither the ADO nor the search warrant was addressed to Douglas Place or Ms. Hardtke, and she had no legal obligation to assist law enforcement in executing the ADO or the search warrant. Furthermore, both the ADO and the search warrant were invalid under 42 CFR, Part 2, and Ms. Hardtke was simply doing her job as directed by her superiors. Ms. Hardtke never lied or made any misleading statements to law enforcement on January 22 or 23, and she simply stated that she cannot assist or do their job for them, which she was not obligated to do in the first place. Ms. Hardtke did absolutely nothing to interfere with a facility-wide search for K.A.H. on January 22, and she likewise did absolutely nothing to interfere with a facility-wide search for K.A.H.'s treatment records on January 23. Sgt. Hart and Lt. Hajicek admitted in their deposition testimony that they voluntarily failed to execute the search warrant and that Ms. Hardtke did nothing to prevent them from executing a facility-wide

search or seizure of evidence. Thus, nothing occurred on January 23 that would permit a reasonable officer to form arguable probable cause that Ms. Hardtke was committing a crime.

In sum, the undisputed evidence shows that the Defendant Officers did not have actual or arguable probable cause to arrest Ms. Hardtke for any offense and that they arrested her in violation of the Fourth Amendment and clearly established precedent. Accordingly, the Court should enter judgment as to liability on Count 1 of Plaintiff's Second Amended Complaint.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for partial summary judgment and enter judgment in her favor as to liability on Counts 1 of the Second Amended Complaint.

THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: <u>June 24, 2024    </u>　　　By: <u>s/ Zorislav R. Leyderman    </u>
　　　　　　　　　　　　　　ZORISLAV R. LEYDERMAN
　　　　　　　　　　　　　　Attorney License No. 0391286
　　　　　　　　　　　　　　Attorney for Plaintiff
　　　　　　　　　　　　　　The Law Office of Zorislav R. Leyderman
　　　　　　　　　　　　　　80 South 8th Street, Suite 900
　　　　　　　　　　　　　　Minneapolis, MN 55402
　　　　　　　　　　　　　　Tel: (612) 876-6626
　　　　　　　　　　　　　　Email: zrl@ZRLlaw.com