UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Amber Hardtke, | File No. 21-cv-02733 (ECT/LIB) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| City of East Grand Forks; Lieutenant Rod Hajicek and Sergeant Tony Hart, in their individual and official capacities, | |
| Defendants. | |

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, MN, for Plaintiff Amber Hardtke.

Joseph E. Flynn and Vicki A. Hruby, Jardine Logan & O'Brien PLLP, Lake Elmo, MN, for Defendants City of East Grand Forks, Lieutenant Rod Hajicek, and Sergeant Tony Hart.

---

In January 2020, officers with the East Grand Forks Police Department attempted to execute arrest and search warrants in a residential treatment center. Plaintiff Amber Hardtke was the center's treatment director. The officers thought that Hardtke was not cooperative in responding to the warrants, so they arrested and charged her with obstructing legal process. In this case, Hardtke claims that Defendants—the City of East Grand Forks and the two arresting officers—violated her federal constitutional rights and committed torts under Minnesota law.

Two motions require adjudication: (1) Defendants seek summary judgment outright. The officers say that qualified immunity shields them from liability for Hardtke's federal

constitutional claims.  The City says Hardtke lacks evidence to show that its training of the officers was constitutionally deficient.  Defendants also say that Hardtke lacks evidence to support her state-law claims and that, if she had evidence, Minnesota's official-immunity doctrine would bar the claims.  (2) Hardtke seeks partial summary judgment in her favor on just the federal qualified-immunity question.

The result is a mixed bag.  Because the officers violated a clearly established Fourth Amendment right, Hardtke's motion will be granted, and Defendants' motion will be denied, as to Hardtke's individual-capacity constitutional claims against the officers. Because Hardtke has not shown the City of East Grand Forks was deliberately indifferent in its training of the officers, Defendants' motion will be granted as to Hardtke's constitutional claim against the City.  Because they are the subject of genuine, material facts disputes, Defendants' motion will be denied as to Hardtke's state-law tort claims.

I[1]

*K.H. is in jail, facing felony charges and subject to a no-contact order.*  The parties' suit-prompting conduct centered around a non-party who will be referred to by just her initials, K.H.  As of January 2020, K.H. was jailed on a felony charge pending in Stearns County, Minnesota District Court.  ECF No. 90.  At the same time, she was subject to a Stearns County District Court order forbidding her from having contact with an individual who also will be referred to by his initials, B.L.  *See* ECF No. 100 at 7.

---

[1]        Unless noted otherwise, the facts are undisputed.  Fed. R. Civ. P. 56(a).

*K.H. is released to a residential drug treatment facility.*  On January 17, the Stearns County District Court ordered K.H. released to a residential drug treatment facility—Douglas Place, in East Grand Forks, Minnesota.  ECF No. 94 at 5.  Douglas Place was at that time (and evidently still is today) operated by Meridian Behavioral Health.  *See* ECF No. 132-1 at 60; *see also Douglas Place*, Meridian Behavioral Health, https://www.meridianprograms.com/program/douglas-place (last visited Dec. 16, 2024).  The court ordered K.H. to "sign releases" and follow Douglas Place's treatment recommendations.  ECF No. 90.

*K.H. violates the no-contact order, and a St. Cloud Police Department officer, Susan Proshek, investigates.*  On January 21, B.L. reported to St. Cloud police that K.H. had communicated with him in violation of the no-contact order.  ECF No. 100 at 7.  That same day, St. Cloud Police Department Officer Susan Proshek met with B.L. and investigated his report.  *Id.*  B.L. explained to Officer Proshek that he had received several documents K.H. sent by mail, including instructions for how B.L. could lift the no-contact order.  *Id.*  B.L. also reported receiving a telephone call that morning from K.H. during which K.H. asked B.L. to "drop" the no-contact order.  *Id.*

*Officer Proshek determines that K.H.'s telephone call originated from Douglas Place.*  B.L. told Officer Proshek that K.H.'s call had come from a number in the (218) area code ending in 4000, and Officer Proshek observed this number displayed on B.L.'s phone.  *Id*. at 7; *see also* ECF No. 98 at 6–7.  Officer Proshek determined the number was associated with Douglas Place.  ECF No. 100 at 8; *see also* ECF No. 98 at 6–7.

*Officer Proshek notifies Douglas Place of K.H.'s no-contact-order violation and that the violation originated from there.* Officer Proshek called Douglas Place's main number and was transferred to a counselor, Kristen Leintz. ECF No. 100 at 8. Leintz did not answer, so Officer Proshek left a message explaining that K.H. had placed a call that morning from Douglas Place to an individual who had a no-contact order against K.H. ECF No. 102 at 3. Leintz returned Officer Proshek's call that afternoon. ECF No. 100 at 8. Leintz told Officer Proshek that the number appearing on B.L.'s phone was connected to a nurse's station within Douglas Place. *Id.* Leintz explained that K.H. had asked to make telephone calls that morning. *Id.* Leintz acknowledged allowing K.H. to make the calls, though she claimed not to know who K.H. was calling. *Id.*

*Officer Proshek notifies K.H.'s probation officer of the no-contact-order violation.* The next morning, on January 22, Officer Proshek notified K.H.'s supervising probation officer, Michael Gilhoi, of K.H.'s no-contact-order violations. ECF No. 94 at 2. Gilhoi, in turn, telephoned Leintz and informed her of the possibility that a warrant might be issued for K.H.'s arrest. ECF No. 102 at 4. Gilhoi explained to Leintz that K.H. posed a flight risk and asked that K.H. not be told of the possibility she might be arrested. *Id.* at 4–5; *see* ECF No. 94 at 3–4. No record evidence shows that anyone at Douglas Place alerted K.H. of the possibility a warrant might be issued or that she might be arrested in response to Gilhoi's call.

*K.H.'s probation officer issues an apprehension-and-detention order.* That same day (January 22), Gilhoi issued an "Apprehension & Detention Order" (or "ADO") for

K.H.  ECF No. 136.[2]  In the order, Gilhoi represented that K.H.'s "temporary detention . . .

[was] necessary to ensure community safety and . . . prevent escape."  *Id.*  Gilhoi asked the

East Grand Forks Police Department to execute the detention order.  *See* ECF No. 135.

   *East Grand Forks police officers attempt to detain K.H.*  Just after 4:30 p.m. on

January 22, East Grand Forks Police Corporal Jacob Thompson and Officer Gilbert

Trevino were dispatched to Douglas Place to apprehend and detain K.H.  *Id.*  Things did

not go smoothly.  After entering the Douglas Place lobby, Corporal Thompson announced

that he and Officer Trevino had "a probation ADO for somebody."  ECF Nos. 124 at 1,

133 at 0:39–0:41.  The officers spoke initially with a Douglas Place supervisor, Carly

Carlson, and identified K.H. as the detention order's subject.  ECF Nos. 124 at 1, 133 at

0:47–0:51.  Carlson left the lobby to find K.H.  ECF No. 133 at 0:58–1:02; ECF No. 132-2

at 52.  The officers did not object or express any concern about Carlson leaving the lobby

alone to find K.H.  ECF No. 133 at 0:58–1:02.

   *Hardtke tries but fails to convince K.H. to surrender to the officers.*  After a short

time, Hardtke became involved.  ECF No. 133 at 1:35–46.  A staff member told Hardtke

the officers were on site "to pick up somebody and Carly is looking for her."  ECF

No. 132-2 at 52.  Hardtke left to assist Carlson.  *Id*.  Hardtke and Carlson located K.H.  *Id.*

at 52–53.  Hardtke spoke with K.H. for five or ten minutes.  *Id.* at 53.  Though Hardtke

encouraged K.H. to "come with [Hardtke] and address her warrant," K.H. ultimately

---

[2]    The apprehension-and-detention order cited several Minnesota statutes as
supporting its issuance.  ECF No. 136.  No one claims Gilhoi lacked authority to issue the
order or that the order was deficient in any respect.

refused. *Id.* at 53–54. As Carlson explained, K.H. "just was adamant that she was not going to go, she did not want to fulfill cleaning up her warrant at that time. So we weren't going to budge the situation much more." ECF No. 96 at 5.

*Hardtke refuses to tell the officers whether K.H. is on site.* Hardtke returned to the lobby to speak with the officers. ECF No. 133 at 17:10–19. After confirming the officers possessed a detention order, Hardtke informed the officers that neither she nor anyone else at Douglas Place could "confirm or deny that the patient's here." ECF No. 124 at 6; ECF No. 133 at 17:19–17:30.

*Officers obtain Hardtke and Carlson's identifications to refer them for possible obstruction charges.* Corporal Thompson told Hardtke that he and Officer Trevino knew K.H. was on site, and he asked Hardtke and Carlson to produce identification. ECF No. 124 at 6; ECF No. 133 at 17:19–18:52. Corporal Thompson explained that he intended to "forward" a description of the evening's events to the county attorney for a possible obstruction charge. ECF No. 124 at 6; ECF No. 133 at 17:19–18:52; *see* ECF No. 135 (indicating in Corporal Thompson's report that "both Hardtke and Carlson were informed that [the officers] would be submitting a report to the prosecuting attorneys [sic] office for charges of obstruction"). Hardtke gave Corporal Thompson her name and role, along with Carlson's, ECF No. 124 at 9–10; ECF No. 133 at 24:35–25:06, and the officers recorded information from Hardtke and Carlson's North Dakota drivers' licenses, ECF No. 133 at 26:18–27:27; ECF No. 139 at 2.

*Hardtke cites federal law as the basis for her refusal to tell the officers whether K.H. is on site.* Before producing her identification, Hardtke told the officers that "CFR Part

42" forbade her and other Douglas Place employees from disclosing the identity of any person receiving treatment at the facility. ECF No. 133 at 23:46–24:00.

*K.H. absconds from Douglas Place.* Later that evening, after the officers and Hardtke had left the facility, K.H. absconded. She left through an unlocked "smoking door" against staff advice. ECF No. 132-2 at 58–59; *see also* ECF No. 137 at 2 ("It was reported that patient left this facility against staff advice around 10pm. A peer reported that she saw [K.H.] getting into a truck and the truck drove off property. Staff discovered that she was no longer in her room and she had made her bed so it looked like she was still in it."). Early the next morning, police found K.H. intoxicated at a bar in Grand Forks, North Dakota. ECF No. 137 at 2.

*A warrant is issued authorizing a search of Douglas Place for K.H.'s intake and discharge records.* The next day (January 23), East Grand Forks Police Department Sergeant Tony Hart applied for a warrant to search Douglas Place for "[i]ntake and discharge paperwork for [K.H.]." ECF No. 139 at 1; *see id.* at 3 (showing signature and date). To support the application, Sergeant Hart attested: (1) that K.H. had been violating a no-contact order; (2) that a Douglas Place counselor had confirmed with K.H.'s probation officer that K.H. was at Douglas Place; (3) that officers had been dispatched to Douglas Place to apprehend K.H.; (4) that Hardtke told the officers "they cannot confirm or deny that [K.H.] is there"; and (5) that K.H. "signed out from [the] facility" after the officers left. *Id.* at 2–3. A Polk County District Judge issued the requested warrant the same day. *Id.* at 4–5. The judge determined that K.H.'s "[i]ntake and discharge paperwork . . .

constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime." *Id.* at 4.

*Officers arrive at Douglas Place with the warrant.* Early in the afternoon of January 23, Sergeant Hart and a second East Grand Forks Police Department officer, Detective Lieutenant Rodney Hajicek, arrived at Douglas Place to execute the warrant. ECF No. 138 at 1. Sergeant Hart approached a person at the front desk and announced he had a search warrant for K.H.'s intake and discharge papers. *Id.* Sergeant Hart handed a copy of the warrant to a Douglas Place employee, Jaime Zuniga. *Id.* Zuniga, in turn, gave the warrant to Hardtke. ECF No. 132-2 at 61–62.

*Hardtke (and other Douglas Place personnel) refuse to give the officers records described in the warrant.* Hardtke sent the warrant to Douglas Place's compliance officer, Emily Peach, who told Hardtke that federal law prohibited disclosure of the information described in the warrant and that the warrant did not override federal law. *Id.* at 62, 65. Hardtke directed a nurse manager to give the officers a form summarizing the facility's obligations under the Code of Federal Regulations, Title 42. *Id.* at 60–61. The form, entitled "Confidentiality of Alcohol and Substance Abuse Programs," was created by Meridian. ECF No. 132-4. Among other things, the form said: "A court order . . . **may not authorize** an employee who has received patient identifying information without consent to disclose that information for any reason, including to conduct any criminal investigation or prosecution of a patient." *Id.* Hardtke also told the nurse not to give the officers records described in the warrant because K.H. had not consented. ECF No. 132-2 at 61–62. After some back and forth with the nurse, Sergeant Hart asked to speak with the

nurse's boss, who turned out to be Hardtke. ECF No. 138 at 1; ECF No. 132-2 at 62. Hardtke refused to produce the records; she explained her understanding that the warrant did not override Title 42, and she told Sergeant Hart that Douglas Place's compliance officer had confirmed this understanding. ECF No. 132-2 at 62.

*The officers contact city and county attorneys' offices.* Sergeant Hart telephoned Crookston City Attorney Tanner Holten. ECF No. 138 at 1. (The East Grand Forks City Attorney was unavailable, and Holten was serving in a back-up capacity. *Id.*) At the call's beginning, Sergeant Hart asked Holten whether he could arrest Hardtke for failing to comply with the warrant. ECF No. 134 at 15:50–16:15 ("We got search warrants approved and the director is failing to comply. Can we arrest her?"). Sergeant Hart said he needed to "make a point here" and that he wanted to "lock her up." *Id*. at 17:28–17:35. Holten, in turn, telephoned Polk County Assistant Attorney Clifford Wardlaw. ECF No. 138 at 1. Wardlaw asked to speak with Hardtke, and Sergeant Hart put his phone on speaker. *Id.* Wardlaw explained to Hardtke that he believed her refusal to produce records reflected an incorrect understanding of the law. ECF No. 134 at 26:07–27:07.[3] Wardlaw then asked to

---

[3]    Wardlaw told Hardtke, "I've kind of run into this with your facility before, about the lack of cooperation with law enforcement and making claims that, HIPAA prevents this, HIPAA prevents that. And so one of the things that we're doing is getting search warrants for material that should have just been provided because it's information that's already known to probation. So, that's why the search warrant was sought. And I'm not aware of anything that would prevent you from complying with a valid court order. Now you tell me there's a federal law, and I was a federal prosecutor for twenty-two years and I'm not aware of any federal law that would prevent the release of information pursuant to a court order." ECF No. 134 at 26:07–27:07.

speak with Peach.   ECF No. 138 at 1.   After speaking with Peach, Wardlaw advised Sergeant Hart to arrest Hardtke.   *Id.*

*Hardtke is arrested.*   After some delay, a female officer arrived to transport Hardtke. ECF No. 132-2 at 66–67.   While waiting for the officer to arrive, an unidentified person asked why Hardtke was being arrested, to which Sergeant Hart replied, "Obstructing, interference with the legal process, whatever."  ECF No. 134 at 34:40–34:50.   Hardtke was booked into jail at 2:06 p.m. and released at 4:06 p.m.   ECF No. 121.   She was cited with two misdemeanor charges, but the citation was dismissed at Wardlaw's direction.   ECF No. 108 at 11–12.   Hardtke was not charged further for her conduct on January 22 or January 23.   *Id.* at 12.

*Hardtke files this case.*   Hardtke asserts claims across four counts in her operative Second Amended Complaint.   ECF No. 71.   Through § 1983, Hardtke claims Sergeant Hart and Detective Lieutenant Hajicek arrested her without probable cause in violation of her Fourth Amendment right to be free from unreasonable seizures.   *Id.* ¶¶ 16–18 (Count I). Again through § 1983, Hardtke asserts a *Monell*/*Canton* claim against the City of East Grand Forks arising from its assertedly "constitutionally deficient training practices with respect to execution of search warrants."   *Id.* ¶¶ 19–22 (Count II).   Under Minnesota common law, Hardtke asserts false-arrest and false-imprisonment claims and a malicious-prosecution claim against all Defendants.   *Id.* ¶¶ 23–26 (Count III) (false arrest and false imprisonment), ¶¶ 27–30 (Count IV) (malicious prosecution).[4]

---

[4]      Hardtke originally named Wardlaw as a defendant, but the claims against him have since been dismissed.  *See* ECF Nos. 52 (suggestion of Wardlaw's death), 77 (stipulation

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. When, as here, there are cross-motions for summary judgment, each side receives the benefit of this rule in response to the other side's motion. *See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). "There is . . . an added wrinkle in this case: existence in the record of a videotape [and an audio recording] capturing the events in question." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The facts will be viewed in the light depicted by these real-time recordings, setting aside versions of the facts that are "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 380; *see, e.g.*, *Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015).

---

of dismissal as to Wardlaw's estate and the estate's personal representative under a *Pierringer* agreement), and 80 (order of dismissal). Hardtke's official-capacity claims against the officers will be treated as claims against the City. *See Smith-Dandridge v. Geanolous*, 97 F.4th 569, 574 n.3 (8th Cir. 2024).

III

A

The logical starting point is answering whether Sergeant Hart and Detective Lieutenant Hajicek possess qualified immunity as a matter of law in response to Hardtke's Fourth Amendment unreasonable-seizure claim. *See Cartia v. Beeman*, --- F.4th ---, No. 23-1650, 2024 WL 5051210, at *2 (8th Cir. Dec. 10, 2024). The general legal framework governing this question is settled, if sometimes difficult to apply. Qualified immunity gives the officers a defense "if: (1) the plaintiff-friendly version of the facts fails to establish a constitutional violation; or (2) the law at the time did not clearly establish the right." *Id.* (quoting *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1085 (8th Cir. 2024)); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009); *Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Id.* If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

Here, owing to the character of Hardtke's claims and the law governing qualified immunity's application to assertedly unconstitutional arrests, it makes better sense just to go straight to the second question—that is, whether the officers possessed arguable probable cause to arrest Hardtke for "aiding an offender" in violation of Minn. Stat.

12

§ 609.495 or for "obstructing legal process" in violation of Minn. Stat. § 609.50. "The Fourth Amendment right of citizens not to be arrested without probable cause is indeed clearly established." *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999). "[A]n officer is entitled to qualified immunity if there is at least 'arguable probable cause'" for a warrantless arrest. *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich v. Pope County,* 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman*, 646 F.3d at 523). If an officer makes a warrantless arrest under the mistaken belief that probable cause for the arrest exists, that officer is shielded by qualified immunity "if the mistake is 'objectively reasonable.'" *Borgman*, 646 F.3d at 523 (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)). The arguable-probable-cause inquiry is not limited to charged offense or offenses; the question is whether the officer was aware of facts justifying a reasonable belief that some offense was being committed. *See Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004).[5] Answering whether an arrest was supported by arguable probable cause requires comparing each charge—that is, the state law or laws the officers claim were arguably violated and

---

[5]    Generally, it would seem impracticable and unwise for a court to undertake this analysis by independently identifying what criminal law or laws might have justified a § 1983 plaintiff's arrest. Here, the officers have identified subdivisions of two Minnesota statutes, § 609.495, subdiv. 1(b) and § 609.50, subdivs. 1(1) and 1(2), as supporting Hardtke's arrest. *See* Defs.' Mem. in Supp. [ECF No. 86] at 20–24. The arguable-probable-cause analysis here will not go beyond these statutes.

justified an arrest—with the plaintiff's arrest-prompting conduct, *see, e.g.*, *Robbins v. City of Des Moines*, 984 F.3d 673, 680 (8th Cir. 2021), keeping in mind that "[i]n close qualified immunity cases, the absence of judicial guidance can be significant because '[p]olice officers are not expected to parse code language as though they were participating in a law school seminar,'" *Walker*, 414 F.3d at 993 (quoting *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1108 (8th Cir. 2004)).

B

1

The officers contend they had arguable probable cause to arrest Hardtke for aiding an offender (K.H.) in violation of Minn. Stat. § 609.495, subdiv. 1(b), based on Hardtke's actions on January 22, 2020.  Defs.' Mem. in Supp. at 20–24.  The version of this statute in effect during January 2020 said this:

> Whoever knowingly harbors, conceals, or aids a person who is on probation, parole, or supervised release because of a felony level conviction and for whom an arrest and detention order has been issued, with intent that the person evade or escape being taken into custody under the order, may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $5,000, or both. As used in this paragraph, "arrest and detention order" means a written order to take and detain a probationer, parolee, or supervised releasee that is issued under section 243.05, subdivision 1; 244.195; or 401.025.

Minn. Stat. § 609.495, subdiv. 1(b) (2020).[6]  The statute may be separated into four essential elements, couched in this case's facts: (1) K.H. was on probation, parole, or

---

[6]    The version of Minn. Stat. § 609.495 in effect on Hardtke's arrest date was enacted in 2016.  *See* 2016 Minn.  Laws  129 (S.F. No. 3113).

14

supervised release because of a felony-level conviction; (2) Hardtke knew or believed that K.H. was on probation, parole, or supervised release because of a felony-level conviction; (3) an arrest-and-detention order was issued to take K.H. into custody for a violation of probation, parole, or supervised release; (4) and Hardtke harbored, concealed, or aided K.H. with the intent that K.H. evade or escape being taken into custody pursuant to the arrest-and-detention order. *Id.*; *see* 10A Minn. Prac., CRIMJIG 29.27 (7th ed. Nov. 2024 Update) (addressing equivalent text in § 609.495, subdiv. 1(b)'s current version).

The Minnesota Court of Appeals addressed the statute's "harbors, conceals, or aids" clause—or, more precisely, an identical clause in a prior version of the statute—in *State v. Ogris*, No. A08-1001, 2009 WL 5088735 (Minn. Ct. App. Dec. 29, 2009). There, the court ascribed common-sense meanings to "harbor," "conceal," and "aid." Regarding "harbor" and "conceal," the court explained:

> "'To harbor a person' means to furnish the person with shelter or food in such circumstances that the person is aided in avoiding detection by lawful authority." 10A *Minnesota Practice,* CRIMJIG 24.11. And under CRIMJIG 24.11, "'To conceal a person' means to make it more difficult for the person to be found." *Id.* *Black's Law Dictionary* defines "harboring" as "[t]he act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien." *Black's Law Dictionary* 733 (8th ed. 2004). *The American Heritage Dictionary* defines "harbor" as "[t]o give shelter to." *The American Heritage Dictionary* 798 (4th ed. 2006). *Black's Law Dictionary* defines "concealment" as "[t]he act of refraining from disclosure; esp., an act by which one prevents or hinders the discovery of something; a cover-up" and "[t]he act of removing from sight or notice; hiding." *Black's Law Dictionary* 306 (8th ed. 2004). *The American Heritage Dictionary* defines "conceal" as "[t]o keep from being seen, found, observed, or discovered." *The American Heritage Dictionary* 381 (4th ed. 2006).

*Ogris*, 2009 WL 5088735, at *4.  In defining "aid," the court first cited the leading legal dictionary's definition of "'aid and abet' as '[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'"  *Id.* (citing *Black's Law Dictionary* 76 (8th ed. 2004)).  The court recognized that, outside the criminal context, "aid" was defined more broadly "as '[t]o help or furnish with help, support, or relief' and '[t]he act or result of helping; assistance.'"  *Id.* (citing *The American Heritage Dictionary* 36 (4th ed. 2006)).  The court concluded that the meanings of "harbor," "conceal," and "aid" "are within the ordinary understanding of a jury," meaning in turn that the district court "did not err by declining to define the terms for the jury."  *Id.*  In other words, in the *Ogris* court's view, applying § 609.495, subdiv. 1(b) does not require lay jurors or anyone else (including police officers) to "parse code language as though they were participating in a law school seminar."  *Walker*, 414 F.3d at 993 (quoting *Lawyer*, 361 F.3d at 1108).

On this record, the undisputed facts show that Sergeant Hart and Detective Lieutenant Hajicek did not possess arguable probable cause to believe that Hardtke "harbored," "concealed," or "aided" K.H. on January 22, 2020.  (1) Hardtke did not "harbor" K.H. because no evidence suggests Hardtke did anything to help K.H. avoid detection.  Hardtke did the opposite; she tried to persuade K.H. to surrender to the officers.  ECF No. 132-2 at 53–54.  Hardtke could not rationally have been charged for K.H.'s refusal to surrender or for failing to use force to bring K.H. to the officers.  It is difficult to understand how Hardtke's statement that she could not "confirm or deny" that K.H. was on site might have aided K.H. to avoid detection.  Hardtke did not give the officers false

information.  She supported her refusal to volunteer K.H.'s presence by citing to what she believed was an overriding federal regulation.  Regardless, Corporal Thompson told Hardtke that he and Officer Trevino *knew* K.H. was on site, ECF No. 133 at 17:19–18:52, making Hardtke's response beside the point.

(2) Hardtke did not "conceal" K.H. because no evidence suggests Hardtke did anything to make it more difficult for the officers to find K.H.  As far as the record shows, when the officers were at Douglas Place, K.H. remained on site too.  The record shows the officers did not leave the lobby area to search for K.H., so no evidence shows where the officers might have found her had they looked or what difficulties, if any, the officers might have encountered.  The point is that no evidence shows Hardtke created any challenges for the officers had they searched for K.H.[7]

(3) Finally, Hardtke did not "aid" K.H. in the sense § 609.495 requires.  That is, she did not help or assist K.H. in evading law enforcement or in committing a crime.  It is true that Douglas Place and its staff—including Hardtke—"aided" K.H. in a different, non-crime-furthering sense.  They provided residential drug treatment services to her in line with a Stearns County District Court order.  Hardtke could not rationally be arrested for

---

[7]    The officers assert that Hardtke "continued to shelter [K.H.] in [K.H.'s] room after [Hardtke] told the police officers that she could neither admit nor deny whether [K.H.] was present at Douglas."  Defs.' Mem. in Supp. at 21.  The officers do not say what they mean by "shelter," and they cite no record evidence to support the factual assertion that K.H. remained in her room while the officers were on site.  Regardless, the assertion favors Hardtke.  It means that, had they searched, the officers would have found K.H. where the officers should reasonably have expected her to be.

aiding K.H. in violation of § 609.495 for lawful treatment-related activities she (and other Douglas Place staff) provided pursuant to the court order releasing K.H. to their care.[8]

The officers argue that a Minnesota Court of Appeals case—*State v. Patch*, 594 N.W.2d 537 (Minn. Ct. App. 1999)—shows that they possessed arguable probable cause to arrest Hardtke for aiding K.H. in violation of § 609.495, but it's difficult to see how. *Patch* did not address an aiding-an-offender charge; it reversed a conviction for obstruction under the 1996 version of Minn. Stat. § 609.50, subdiv. 1(1). *Patch*, 594 N.W.2d at 537–40. The court of appeals explained in *Patch* that the Minnesota Supreme Court had "in a 1988 case rejected an overbreadth challenge to the [obstruction] statute, construing it narrowly as 'directed solely at physical acts.'" *Id.* at 538 (citing *State v. Krawsky*, 426 N.W.2d 875, 877 (Minn. 1988)). The court of appeals also explained that the supreme court had "rejected the claim that the statute applied to verbal conduct," unless the "words by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties." *Id.* (quoting *Krawsky*, 426 N.W.2d at 877). Applying these principles, the court based its reversal of Patch's conviction on the absence

---

[8] There is another problem with applying § 609.495 to support Hardtke's arrest. The statute requires that K.H. have been "on probation, parole, or supervised release *because of a felony level conviction*." Minn. Stat. § 609.495, subdiv. 1(b) (emphasis added). As far as the record shows, K.H.'s designation to Douglas Place did not result from a felony (or lesser) conviction. The apprehension-and-detention order Gilhoi sent to the East Grand Forks Police Department noted clearly that K.H. was "on pre-trial supervision" for domestic assault charges. ECF No. 136. Because the officers could not reasonably have concluded that Hardtke harbored, concealed, or aided K.H., it is not necessary to address whether this problem might independently have deprived the officers of arguable probable cause to arrest Hardtke.

of evidence showing that Patch physically obstructed an officer or engaged in verbal conduct that had the effect of physically obstructing or impeding an officer. *Id.* at 538–39.

It is true the court included the following observation in its opinion: "The state could have charged Patch with aiding an offender to avoid apprehension if it could prove Patch knew [the person she aided] had committed a felony." *Id.* at 540. For two fundamental reasons, this observation does not support the conclusion that the officers had arguable probable cause to arrest Hardtke for aiding K.H. under § 609.495. First, the observation is *obiter dictum*. It was not necessary to, and played no role in, *Patch*'s disposition. Second, any guidance the observation might provide is limited by *Patch*'s facts, and they are materially different from this case's facts. Patch did not, as the officers seem to imply, merely tell a felon that "[t]he cops are coming to get you." *Patch*, 594 N.W.2d at 538. Patch also "helped her look for a back door to make her escape," stood lookout at the front door, and "offered her a ride and was 'pretty insistent' that she come with her." *Id.* We don't have anything like that here.

The officers also rely on *Ogris*, arguing it supports their "claim of probable cause to arrest [Hardtke] for violating Minn. Stat. § 609.495, subd. 1(b)." Defs.' Mem. in Supp. at 23. *Ogris*, unlike *Patch*, addressed a conviction under § 609.495, subdiv. 1(b), but that is where the similarities between *Ogris* and this case end. In *Ogris*, officers sought to execute a bench warrant for the arrest of a woman named Kara Olson. 2009 WL 5088735, at *1. The officers went to a residence, thinking they might find Olson there. *Id.* The officers encountered Ogris at the door and told him they were looking for Olson. *Id.* Ogris told the officers Olson was his girlfriend and that she had moved to Minneapolis. *Id.*

Several times Ogris told the officers that Olson was not in the residence. *Id.* at *1–2. And Ogris told the officers that they could not enter the residence, offering as justifications "that he had locked himself out and that the unit's resident, 'Judy,' was passed out drunk on vodka." *Id.* at *2. The officers eventually obtained permission to search the residence and found Olson hiding in a closet and arrested her. *Id.* Ogris's conviction-justifying facts are materially different from this case's facts. Hardtke never told the officers that K.H. wasn't at Douglas Place. (If she had, it wouldn't have done any good. The officers knew K.H. was at Douglas Place.) Hardtke did not give the officers any reason—much more a false reason—why they could not search Douglas Place for K.H. And there is no evidence showing that whatever Hardtke told K.H. prompted K.H. to hide or evade the officers while they were on site. *Ogris* does not show the officers had arguable probable cause to arrest Hardtke for aiding K.H. in violation of § 609.495, subdiv. 1(b).

2

The officers argue they had arguable probable cause to arrest Hardtke for obstructing legal process in violation of Minn. Stat. § 609.50, subdivs. 1(1) and (2), based on Hardtke's actions on January 22 and 23, 2020. Defs.' Mem. in Supp. at 20–24. As relevant here, the version of this statute in effect during January 2020 criminalized the intentional obstruction, hinderance, or prevention of "the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense," and the intentional obstruction, resistance, or interference "with a peace

officer while the officer is engaged in the performance of official duties." Minn. Stat. § 609.50, subdivs. 1(1), (2).[9]

As discussed, the Minnesota Supreme Court long ago in *Krawsky* construed § 609.50 narrowly as "directed solely at physical acts." *Krawsky*, 426 N.W.2d at 877. The court summarized the statute as follows:

> [T]he statute forbids intentional physical obstruction or interference with a police officer in the performance of his official duties. The statute may be used to punish "fighting words" or any other words that by themselves have the effect of physically obstructing or interfering with a police officer in the performance of his duties—*e.g.*, the statute may be used to punish a person who runs beside an officer pursuing a felon in a public street shouting and cursing at the officer if the shouting and cursing physically obstructs the officer's pursuit and if the person intends by his conduct to obstruct or interfere with the officer. However, the statute does not apply to ordinary verbal criticism directed at a police officer even while the officer is performing his official duties . . . .

*Id.* at 877–78 (citation omitted). The court observed also that the obstruction statute does not punish "interrupting" an officer, even intentionally. *Id.*; *see also State v. Tomlin*, 622 N.W.2d 546, 548 (Minn. 2001) (recognizing that § 609.50 is "directed solely at a particular kind of physical act that physically obstructs or interferes with an officer" or "in limited circumstances . . . 'fighting words' [that] have the effect of physically obstructing or interfering with an officer"). Though *Krawsky* addressed an earlier version of the statute, its interpretation remains valid. *See Hoyland v. McMenomy*, 869 F.3d 644, 654 (8th Cir. 2017) ("As Minnesota law makes abundantly clear, obstruction must be either

---

[9] The version of Minn. Stat. § 609.50 in effect on Hardtke's arrest date was enacted in 2008. *See* Act of May 13, 2008, ch. 304 § 1 (H.F. No. 2877).

physical obstruction or verbal conduct, such as fighting words, that has the effect of physically obstructing officers in the performance of their duties. Nowhere in Minnesota law does mere physical presence at a distance constitute obstruction."), *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019); *see Laney v. City of St. Louis,* 56 F.4th 1153, 1157 n.2 (8th Cir. 2023) (recognizing abrogation). The officers cite no authority suggesting *Krawsky* is no longer good law.

On this record, the undisputed facts show that Sergeant Hart and Detective Lieutenant Hajicek did not possess arguable probable cause to believe that Hardtke violated § 609.50 on January 22 or 23, 2020. Hardtke did not physically obstruct the officers on either date. And what few words she spoke—though evidently not what the officers wanted to hear—cannot reasonably be characterized as "fighting words," much more fighting words that might have had the effect of physically obstructing or interfering with the officers' performance of their duties.

The officers seem to advance two January 23-connected arguments to support that they possessed arguable probable cause to arrest Hardtke for violating § 609.50, but neither is persuasive. First, the officers appear to argue that Hardtke had a duty to comply with the officers' January 23 execution of the search warrant. *See* Defs.' Mem. in Supp. at 21. The officers do not describe the precise contours of the duty they believe Hardtke had. The officers cite no authority supporting the proposition that an organization's employees have a duty to affirmatively assist officers in their execution of search warrants. The proposition seems questionable. *Cf. Andresen v. Maryland*, 427 U.S. 463, 473–74 (1976) (recognizing that "the individual against whom the search is directed is not required to aid in the

discovery, production, or authentication of incriminating evidence"). Regardless, no facts show that Hardtke physically interfered with the officers' execution of the warrant. Hardtke told the officers that she believed federal law prohibited her from giving the officers K.H.'s records. ECF No. 132-2 at 62. And as far as the record shows, nothing prevented the officers from searching for K.H.'s records or explains why they did not. Second, the officers argue that their reliance on Wardlaw's January 23 directive to arrest Hardtke gave them arguable probable cause to do just that. Following the prosecutor's advice "does not automatically cloak [officers] with qualified immunity." *Frye v. Kan. City Mo. Police Dept.*, 375 F.3d 785, 792 (8th Cir. 2004) (alteration in original); *see Womack v. City of Bellefontaine Neighbors*, 193 F.3d 1028, 1031 (8th Cir. 1999). Here, Wardlaw had no more arguable probable cause than the officers. His directive to arrest Hardtke was based just on information the officers communicated to him about Hardtke's conduct in response to the search warrant on January 23. *See* ECF No. 134 at 19:41–19:45. That the officers obeyed Wardlaw's directive does not help them.

*

The undisputed facts establish that Sergeant Hart and Detective Lieutenant Hajicek lacked arguable probable cause to arrest Hardtke for aiding K.H. in violation of Minn. Stat. § 609.495 or for obstruction in violation of Minn. Stat. § 609.50. Therefore, Hardtke's motion for partial summary judgment will be granted. To the extent it concerns the qualified-immunity defense to Hardtke's § 1983/Fourth Amendment claim against the officers, Defendants' summary-judgment motion will be denied.

IV

Hardtke's § 1983 claim against the City of East Grand Forks advances a failure-to-train theory. "It is well established that a municipality cannot be liable under § 1983 under a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Robbins*, 984 F.3d at 681 (quotation omitted). "A municipality may only be liable for a constitutional violation resulting from (1) an official municipal policy; (2) an unofficial custom; or (3) failure to train or supervise." *Id.* at 681–82.

"It is difficult to establish a municipality's culpability based on failure to train, which must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* at 682 (cleaned up). "Deliberate indifference requires proof the municipality disregarded a known or obvious consequence of its action or inaction." *Id.*; *see Poemoceah v. Morton County*, 117 F.4th 1049, 1057–58 (8th Cir. 2024) ("A failure to train is actionable under § 1983 if, 'in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989))). The municipality's deliberate indifference must cause the constitutional violation. *Smith-Dandridge v. Geanolous*, 97 F.4th 569, 578 (8th Cir. 2024). That is, the failure to train "must be the 'moving force' that led to the alleged deprivation of a constitutional right." *Id.* (quoting *Speer v. City of Wynne*, 276 F.3d 980, 985–86 (8th Cir. 2002)).

The constitutional deprivation here was an arrest without probable cause, but Hardtke has not identified evidence showing the City's deliberate indifference to arrests

without probable cause.  (1) Hardtke cites record evidence she claims demonstrates "that East Grand Forks Police Chief Michael Hedlund had notice there was an ongoing conflict between Douglas Place and East Grand Forks Police pertaining to sharing information about Douglas Place patients."  Pl.'s Mem. in Opp'n [ECF No. 143] at 38.  The cited evidence includes email communications between Sergeant Hart on one side, and Hardtke and Zuniga on the other.  ECF No. 144-5 at 20–25.  These communications address the City and County Attorney's concerns regarding Douglas Place's failure to report drug crimes committed on site, adverse community consequences caused by Douglas Place's operations and policies, and Douglas Place's response to these issues.  *See id.*  These communications do not mention or touch the subject of arrests or the East Grand Forks Police Department's arrest practices.  *See id.*  They do not show a need for more training concerning arrest practices or the subject of probable cause.

(2) Hardtke argues that the officers' January 22 threat to refer Hardtke for obstruction charges shows the City's deliberate indifference.  Pl.'s Mem. in Opp'n at 39.  This is not persuasive.  As a reminder, that day's events involved a failed attempt by Corporal Thompson and Officer Trevino to execute the arrest-and-detention order for K.H., interactions between the officers and Hardtke (and other Douglas Place staff), and Corporal Thompson's threat to refer Hardtke for obstruction charges.  It is difficult to understand how anything that happened on January 22 would have given the City notice of the need to train its officers regarding arrest practices or the subject of probable cause.  No arrest occurred that day, much more a problematic arrest.  And Hardtke does not claim that

anything the officers did on January 22 was unlawful. She has not sued Corporal Thompson or Officer Trevino.

(3) Finally, Hardtke relies on the opinion of her expert witness "that [the] East Grand Forks Police Department failed to train their [sic] officers to understand the legal responsibilities and restrictions that apply to a drug and alcohol treatment facility like Douglas Place." ECF No. 132-6 at 8; *see* Pl.'s Mem. in Opp'n at 39. For several reasons, this opinion does not show the City's deliberate indifference. The expert identifies no prior problematic arrests or other conduct that might have notified the City of the need to train officers regarding federal regulations governing residential treatment centers. If the expert had identified that sort of thing, a causation problem would remain. Again, the unconstitutionality of Hardtke's arrest resulted from the absence of probable cause to think Hardtke aided K.H. or obstructed legal process in violation of Minnesota law. No doubt Hardtke's understanding of the facility's obligations under federal regulations motivated her statements and conduct, but answering whether the officers had probable cause to arrest Hardtke does not depend on Hardtke's motivations. To put it another way, the unconstitutionality of Hardtke's arrest did not result from the officers' lack of knowledge regarding federal regulations, so it is difficult to understand how training regarding the regulations would have solved the lack-of-probable-cause problem. If that weren't so, Hardtke's expert does not opine that Hardtke (or Douglas Place) had a correct understanding of Title 42. ECF No. 132-6 at 8. Nor does the expert rule out the possibility that any training might reasonably have involved a different or contrary understanding of

the regulations.  Hardtke has not shown how training in this area might have prevented her unconstitutional arrest.

V

Cases from this District dating back years consistently treat Minnesota false imprisonment and false arrest claims as essentially a single claim when they are asserted against a law enforcement officer.  *See, e.g.*, *Tillis v. City of Minneapolis*, No. 12-cv-324 (ADM/TNL), 2013 WL 6062187, at *9 (D. Minn. Nov. 18, 2013) ("Under Minnesota law, the tort of false imprisonment, when asserted against a [law enforcement officer], is similar to that of false arrest." (quoting *Cornelious v. Brubaker*, No. 01-cv-1254 (MGD/JGL), 2003 WL 21511125, at *11 (D. Minn. June 25, 2003))); *Sang v. City of St. Paul*, No. 09-cv-455 (RHK/SRN), 2010 WL 2346600, at *7 (D. Minn. June 8, 2010) (same); *Mann v. Shevich*, No. 08-cv-5202 (ADM/RLE), 2010 WL 653867, at *8 (D. Minn. Feb. 23, 2010) (same); *Adewale v. Whalen*, 21 F. Supp. 2d 1006, 1016 (D. Minn. 1998) (same).  "Both torts require an unlawful arrest performed by the defendant."  *Adewale*, 21 F. Supp. 2d at 1016.  "Under Minnesota law, 'if an arrest is made without proper legal authority, it is a false arrest, and so false imprisonment.'"  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Lundeen v. Renteria*, 224 N.W.2d 132, 135 (Minn. 1974)).  An arrest made without probable cause lacks proper legal authority.  *Perkins v. St. Louis County*, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986).

Obviously, my determination in the § 1983/Fourth Amendment context that Sergeant Hart and Detective Lieutenant Hajicek lacked arguable probable cause to arrest Hardtke means the officers arrested and detained her without proper legal authority for

27

purposes of her false arrest and false imprisonment claims.  If that were the only issue, Defendants' summary-judgment motion would be denied on that basis.  There is more to this question, however.

The officers argue that they—and by extension, the City—possess official immunity as a matter of law in response to Hardtke's false arrest and false imprisonment claims.  "As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." *Heard v. City of Red Wing*, 393 F. Supp. 3d 785, 792 (D. Minn. 2019) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)); *accord Ward v. Olson*, 939 F. Supp. 2d 956, 964 (D. Minn. 2013) (quoting *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001)).  If an official's actions require the exercise of discretion, he is entitled to official immunity "unless the official committed a willful or malicious wrong." *Heard*, 393 F. Supp. 3d at 792 (citing *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992)).

Cases establish that the officers' actions in arresting Hardtke were discretionary for qualified immunity purposes.  "Generally, police officers are classified as discretionary officers entitled to [official] immunity." *Ward*, 939 F. Supp. 2d at 964 (quoting *Johnson*, 453 N.W.2d at 42); *see also Yang v. City of Brooklyn Park*, 194 F. Supp. 3d 865, 874 (D. Minn. 2016) ("Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice." (quoting

28

*Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006))). Hardtke identifies no reason to reach a different conclusion here.

Cases also establish, however, that a reasonable jury could find the officers acted willfully or maliciously. In answering this question, "courts consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited. This contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Heard*, 393 F. Supp. 3d at 792 (cleaned up) (quoting *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007)); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 500–01 (8th Cir. 2009) ("In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991))). The malicious-wrong exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107. "The determination of whether an officer acted maliciously or willfully is usually a question of fact for the jury." *Ward*, 939 F. Supp. 2d at 964 (citing *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988)). Here, the same facts that show the absence of arguable probable cause to support Hardtke's arrest—that is, the officers' violation of a clearly established right—would give a reasonable jury ground to find the officers acted willfully or maliciously for official immunity's purposes.

VI

The law governing the merits of Hardtke's malicious-prosecution claim seems clear

enough:

> To state a malicious-prosecution claim in Minnesota, a party must allege that "(1) the suit [was] brought without probable cause and with no reasonable ground on which to base a belief that the plaintiff would prevail on the merits; (2) the suit [was] instituted and prosecuted with malicious intent; and (3) the suit . . . ultimately terminate[d] in favor of the defendant." *Stead-Bowers v. Langley*, 636 N.W.2d 334, 338 (Minn. Ct. App. 2001). "Probable cause is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Allen v. Osco Drug, Inc.*, 265 N.W.2d 639, 643 (Minn. 1978) (internal quotation marks omitted). "Only reasonable belief that probable cause existed is necessary to negate a malicious prosecution claim." *Dunham v. Roer*, 708 N.W.2d 552, 569 (Minn. Ct. App. 2006) (internal quotation marks omitted).

*Nygard v. City of Orono*, 39 F.4th 514, 521 (8th Cir. 2022). "Malice," for malicious-

prosecution's purposes, is "the intentional doing of a wrongful act without legal

justification or excuse, or, otherwise stated, the willful violation of a known right." *Rico*,

472 N.W.2d at 107 (quotation omitted). A malicious-prosecution "plaintiff must prove, at

a minimum, that the defendant knew that its actions were wrong." *Hirtzinger v. Pinnacle*

*Airlines, Inc.*, No. 06-cv-1609 (PJS/RLE), 2008 WL 835644, at *16 (D. Minn. Mar. 27,

2008) (citing *Osco Drug, Inc.*, 265 N.W.2d at 646).

Judged against these elements, Hardtke's malicious-prosecution claim seems

trial-worthy. (1) The officers lacked probable cause to arrest Hardtke and charge her with

obstruction under Minn. Stat. § 609.50, subdiv. 1(2). *See supra* section III(B)(2). (2) A

reasonable jury could find that the officers knew their actions were wrong. Legally, the absence of arguable probable cause means any reasonable officer knew or should have known that Hardtke's arrest lacked legal justification and was wrong. And, whether required or not, there is evidence showing the officers possessed a subjective intent to execute the warrant on January 23 with the aim, not of retrieving K.H.'s records, but of arresting Hardtke. In his deposition, Sergeant Hart testified that the search warrant for K.H.'s records was intended solely as a means of investigating Hardtke and Carlson. ECF No. 108 at 7 ("Q: Can you tell me who was the subject of the investigation for which you obtained a search warrant? A: It would have been Amber Hardtke and Carly Carlson. Q: And so [K.H.] was no longer under investigation when you saw the search warrant? A: No. She had already absconded from the Douglas House. Q: So the sole basis for your investigation when you came to Douglas Place, when you initially obtained a search warrant and then you came to Douglas Place to execute it, at this point you're solely investigating Douglas Place Staff, and not [K.H.]; is that true? A: Correct."). (3) There is no dispute the charges against Hardtke were dismissed. ECF No. 144-3.

Defendants' arguments for summary judgment on this claim are not persuasive. Defendants cite *Thompson v. City of Minneapolis*, No. 06-cv-3131 (JMR/FLN), 2008 WL 11458593 (D. Minn. Apr. 22, 2008), and *Jacobson v. Mott*, No. 07-cv-4420 (DWF/RLE), 2009 WL 113379 (D. Minn. Jan. 16, 2009), for the proposition that police officers cannot be sued for malicious prosecution because "police officers are not prosecutors." Defs.' Mem. in Supp. at 34. Consider *Thompson*. There, the court entered summary judgment against a malicious prosecution claim, along the way observing, "Officers . . . are not

prosecutors." 2008 WL 11458593, at *9–10.  The court also acknowledged, however, that officers who play more than a "'passive' role in the initiation of criminal charges" could be subject to a malicious-prosecution claim.  *Id.* at *10 (quoting *Morgan v. McLaughlin*, 188 N.W.2d 829, 831 (Minn. 1971)).  *Jacobson* is consistent with these rules.  *See* 2009 WL 113379, at *3–4.  Here, the officers played more than a passive role in the initiating charges.  Defendants also cite cases for the proposition that a malicious-prosecution claim cannot survive to trial if an arrest was justified by probable cause.  *See* Defs.' Mem. in Supp. at 35.  The absence of probable cause to justify Hardtke's arrest means these cases are beside the point.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.  Defendants City of East Grand Forks, Lieutenant Rod Hajicek, and Sergeant Tony Hart's Motion for Summary Judgment [ECF No. 84] is **GRANTED IN PART AND DENIED IN PART** as follows:

   a.  The motion is **GRANTED** as to Count 2 of Plaintiff Amber Hardtke's Second Amended Complaint.

   b.  The motion is in all other respects **DENIED**.

2.  Plaintiff Amber Hardtke's Motion for Partial Summary Judgment [ECF No. 129] is **GRANTED**.

Dated: December 16, 2024                      s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court